Andrea R. Woods, WSBA #48265 (*pro hac vice*)
Edwin S. Budge, WSBA #24182 (*pro hac vice*)
Erik J. Heipt, WSBA #28113 (*pro hac vice*)
Budge & Heipt, PLLC
808 East Roy Street
Seattle, WA 98102
(206) 624-3060
Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA
## TUCSON DIVISION

| | |
|---|---|
| **THE ESTATE OF MARY FAITH CASEY A/K/A MARY HUTCHINSON**, by and through its Co-Personal Representatives, Karina Kepler and Carlin Casey; **KARINA KEPLER**, an individual; and **CARLIN CASEY,** an individual,<br><br>PLAINTIFFS<br><br>v.<br><br>**NAPHCARE, INC.**, *an Alabama corporation;* **PIMA COUNTY, ARIZONA**; **THE HON. CHRIS NANOS**, *in his official capacity as Pima County Sheriff*; **JASON CHAMBERLAIN, R.N.**, *in his individual capacity;* **LEO EASLEY, N.P.**, *in his individual capacity*; **MIKELL KARSTEN, M.D.**, *in his individual capacity;* **JOHN SAMAAN, M.D.**, *in his individual capacity*; and **MATTHEW WOODS, M.H.P.**, *in his individual capacity*,<br><br>DEFENDANTS. | **PLAINTIFFS' ORIGINAL COMPLAINT FOR DAMAGES, DECLARATORY RELIEF, AND REQUEST FOR JURY TRIAL**<br><br>No. _____<br><br>(JURY DEMAND) |

## I.   PRELIMINARY STATEMENT

1.        This is a civil rights action under 42 U.S.C. § 1983 and Arizona law arising from events that happened when Mary Faith Casey was confined in the Pima County Jail, located in Tucson, Arizona.

COMPLAINT – Page 1

2.      Ms. Casey, a 65-year-old mother and grandmother, starved to death because she was confined for 110 days without access to desperately needed psychiatric medications and healthcare. Ms. Casey was incarcerated because of her poverty and homelessness: a lack of residential address triggered a violation of her probation and a subsequent arrest. But from the moment she entered the jail, and over the weeks and months that followed, Defendants unconstitutionally deprived Ms. Casey of necessary medical and mental health care. Defendants thus knowingly exposed Ms. Casey to a clear risk of serious harm, causing a precipitous and continuous deterioration in her mental and physical health. As a result, she suffered grievous and needless life-ending misery.

3.      During this same period, Ms. Casey was unconstitutionally deprived of access to the courts and to her public defender. She was thus completely closed off from the outside world, including from anyone who might have attempted to help her. By the time she was eventually released from jail, her condition had become so dire that her life could not be saved. Ms. Casey was hospitalized, then placed on hospice care, and then died. The cause of her death was "protein calorie malnutrition."

4.      Defendants illegally and unconstitutionally robbed Ms. Casey of her life, and her children of their mother. And her death was not an isolated incident: Ms. Casey is one of dozens of people who have died in recent years due to the entity-Defendants' negligence and indifference. Because such a preventable horror should *never* happen in an American jail, her estate and surviving children bring this lawsuit seeking justice under federal and state law against all named defendants. Among them is NaphCare, Inc., a major player in the multi-billion-dollar for-profit correctional healthcare industry. NaphCare received millions of taxpayer dollars in exchange for

its obligation to care for Ms. Casey and those like her in Pima County, and it failed miserably to live up to those responsibilities.

## II.  SUMMARY

5.     All people, no matter their circumstances or station in life, are owed basic protections when the government chooses to incarcerate them. Among these are adequate medical and mental health care, access to their attorney, and access to the courts. But Defendants deprived Ms. Casey of these foundational rights. As a result, she precipitously declined under their watch—losing her mental faculties and wasting away from 145 to 90 pounds in a span of nearly four months in jail. By the time her public defender and loved ones learned of her condition, it was too late to save her.

6.     Ms. Casey was arrested on April 30, 2022, after a commercial security guard called the police to remove two homeless people from a parking lot. When the police arrived, they learned of an outstanding arrest warrant for Ms. Casey whose homelessness had triggered a probation violation a few weeks earlier. Ms. Casey was arrested and booked into the Pima County Jail. Upon admission to the jail, she was in good health and documented as having a "medium build" and weighing 145 pounds.

7.     Ms. Casey had a long history of mental illness, and upon her booking, immediately requested to be placed on psychiatric medications. Because she had been previously confined in the Pima County Jail in 2021, Ms. Casey's medical and mental health history—including the list of psychiatric medications that had proved instrumental to maintaining her cognitive health in the past—were readily accessible to Defendants. But no one ran a search of that history when she was booked. Consequently, she did not receive any of the medications, including anti-psychotics, that she needed.

COMPLAINT – Page 3

8.    Without medication, Ms. Casey quickly and predictably declined. Untreated, her mental illness caused her to experience symptoms of psychosis, one of which impaired her ability to eat or swallow. She stopped ingesting food or fluids. Over time, her symptoms became more profound, and her failure to take in adequate nutrition caused her to waste away. Other detainees and numerous custodial staff noticed her grossly insufficient food and water intake and general deterioration, but medical staff failed to treat her with the urgency required. Instead of recovering, Ms. Casey thus continued to decline.

9.    Within a month of her confinement, Ms. Casey's public defender and cellmates realized that she was not sufficiently eating or drinking. Within two months, she was too weak to shower, care for her basic needs, get out of bed, walk, or attend recreation time. Within three months, severely malnourished and delusional, Ms. Casey was wasting away and rendered incontinent. Her health in the jail continued to deteriorate on an alarming trajectory towards death.

10.    Defendants' meager efforts to assist Ms. Casey were far too little and way too late. Despite her obvious need for a speedy mental health evaluation when she first entered the jail, it took nearly a month for her to be seen. She was first evaluated by Defendant Matthew Woods, a mental health professional, on May 26, 2022. But Mr. Woods lacked prescribing authority and did not promptly pursue action to get Ms. Casey on medication. She was not seen by a prescribing provider until June 12, 2022, when nurse practitioner Leo Easley saw her. Nurse Easley prescribed Ms. Casey a single anti-depressant despite readily available records that she had depended on several different kinds of psychotropic medications in the past. She was not seen again by any provider until more than a month after that, when, on July 17, 2022, Nurse Easley inexplicably *discontinued* Ms. Casey's sole medication. Despite knowing of Ms. Casey's "deteriorating" condition and "significant weight loss," Nurse Easley left her adrift, without medication, and

proposed only to follow up with her in 30 days, by which time her condition would become so grim that her very life was in jeopardy. In fact, Nurse Easley never returned to see Ms. Casey again.

11.     Because of her lack of adequate nutrition, Ms. Casey's weight dropped dramatically during her 110-day confinement. When she entered the jail on April 30, 2022, she was noted to weigh approximately 145 pounds. By June 25th she weighed 106 pounds. By July 12th she weighed 102 pounds. By August 4th she was too weak to stand on a scale unassisted, but when propped up by others, her weight was recorded at 76 pounds. That same day, a hospital recorded her weight (without assistance) at 79 pounds before she received IV fluids. On August 17, 2022—one day before being released from jail, her weight was recorded (also unassisted) at 91 pounds.

12.     Before she was finally released from Pima County custody to die, Ms. Casey was hospitalized three times in August 2022. These hospitalizations occurred despite a NaphCare policy of avoiding off-site medical care, discussed below, indicating that Ms. Casey's condition was very grave. From August 4-6, 2022, she was seen at Banner University Medical Center for failure to thrive and significant weight loss while in jail. There, hospital caregivers ran a series of tests on Ms. Casey which came back unremarkable, indicating that her weight loss was not caused by another medical condition. Banner staff also noted that she had bedsores where her hipbones protruded from her body. On August 8, 2022, Ms. Casey was rushed to St. Mary's hospital because of low oxygen saturation and cool, clammy skin. Caregivers at St. Mary's separately ruled out any possible comorbidities, such as cancer or heart disease, as the cause of her extreme weight loss. Indeed, Ms. Casey's dramatic weight loss in jail and the resulting impact to her physical health stemmed solely from her untreated mental illness. She was seen again at St. Mary's Hospital on August 11-12, 2022, where she was stabilized with fluids due to extreme weakness and distress.

13.     Towards the very end of her confinement, a NaphCare provider named Dr. John Samaan finally *started* Ms. Casey on a slate of drugs that he could readily see "ha[d] helped her in the past." But this did not happen until August 9, 2022—101 days into her incarceration. By the time Dr. Samaan finally entered this order, Ms. Casey's condition had become so grim that he suspected she was catatonic and contemplated that she would have trouble receiving her medications. Though it was clear that Ms. Casey would have great difficulty reliably taking oral medication due to her problems swallowing, Dr. Samaan did not promptly explore alternative methods such as an IV, orally dissolvable tablets, or intramuscular injection. While Dr. Samaan instructed jail medical staff to "crush and float" Ms. Casey's medications, meaning to dissolve them in liquid, not a single nurse attempted to do so. In any event, this instruction fell short due to Ms. Casey's well-documented inability to swallow. As a result of being prescribed medication too late and in a form she could not take, Ms. Casey's condition continued to worsen over the next nine days. By mid-August, she was suffering from bowel and bladder incontinence, unable to understand or communicate, incapable of participating in her own self-care, and suffering from a breakdown in her perinium and other parlous physical symptoms—all manifesting from her untreated mental illness.

14.     As her condition deteriorated, Ms. Casey was rendered too sick to receive visits from her public defender or attend court. Her family was not able to contact her at any point in her 2022 incarceration, despite numerous efforts to do so. She was thus unable to alert the outside world of her condition.

15.     When Ms. Casey was finally taken to a court appearance by wheelchair on August 16, 2022, her dramatically altered appearance shocked both Presiding Judge Howard Fell and her public defender, Darlene Edminson. Both agreed that "she looks like she's dying." Upon seeing

the severity of Ms. Casey's condition, her public defender immediately filed an emergency petition to release her from jail. Within 48 hours, she was released to Banner Hospital for the last time, her criminal charges completely dismissed.

16.    But care came too late for Ms. Casey. By the time she was discharged on August 18, 2022, her life was beyond saving. When her family finally learned of her condition and rushed to Banner Hospital to see her, they were faced with limited care options such as a high-risk, painful feeding tube or electroconvulsive therapy that her body was too weak to tolerate. Ultimately, her family, medical team, and a hospital ethics committee all agreed that further treatment was futile due to her severely weakened state, fragility, and extremely compromised mental condition. She was released to at-home hospice care on September 22, 2022, and died two weeks later of protein calorie malnutrition on October 6, 2022.

17.    All the while, as Ms. Casey was suffering and dying, NaphCare was profiting from a multi-million-dollar contract with Pima County under which it was the exclusive provider of medical and mental health care for hundreds of people at the jail. Indeed, a few days before Ms. Casey died, Pima County renewed its contract with NaphCare. The value of that renewed contract is nearly $63 million.

## III. JURISDICTION AND VENUE

18.    This Court has original subject matter jurisdiction over Plaintiffs' civil rights claims under 28 U.S.C. § 1331 and 28 U.S.C. § 1343. The Court has supplemental jurisdiction over Plaintiffs' related state law claims under 28 U.S.C. § 1367(a).

19.    Venue is proper in this forum under 28 U.S.C. § 1391(b)(2) because all the events giving rise to Plaintiffs' legal claims occurred in this judicial district.

## IV. PARTIES

20.    The **Estate of Mary Faith Hutchinson a/k/a Mary Faith Casey** ("the Estate") was formed under Arizona law for the purpose of vindicating the rights of Mary Faith Casey (a/k/a Hutchinson) ("Ms. Casey") in this action. The Estate acts through its court-appointed co-personal representatives, Carlin Casey and Karina Kepler. Mary Faith Casey was a U.S. citizen and California native residing in Pima County, Arizona. She died after Defendants, acting below the standard of care and with deliberate indifference to her serious needs, allowed her medical and mental health to precipitously decline in the Pima County Adult Detention Center ("Pima County Jail" or "the jail") over nearly four months in 2022. Prior to her death, Ms. Casey was awaiting adjudication of a probation violation based on her inability to maintain an address. She had not been sentenced to any term of punishment for her probation violation and was incarcerated awaiting a disposition of this minor, technical violation. As a pre-adjudication detainee, she was entitled to all protections guaranteed under the Fourteenth Amendment to the United States Constitution and other applicable law.

21.    Individual plaintiff **Karina Kepler** is one of two children of Mary Casey and her youngest child. She lives in Palm Desert, California.

22.    Individual plaintiff **Carlin Casey** is the other of Mary Casey's children and is her oldest child. He lives in Tucson, Arizona.

23.    Defendant **NaphCare, Inc.** ("NaphCare") is a private, for-profit correctional healthcare corporation headquartered in Birmingham, Alabama, and incorporated under Alabama law. Its registered agent for service of process is the Corporation Service Company, 8825 N. 23rd Ave. Suite 100, Phoenix, Arizona, 85021. NaphCare is in the business of contracting with correctional facilities around the country to provide medical and mental health care to detained people. It is one of the largest companies in the multi-billion-dollar private correctional healthcare

COMPLAINT – Page 8

industry. NaphCare has a semi-national presence, holding contracts with government operators of detention facilities in numerous states. At all relevant times, NaphCare was doing regular and systematic business in Arizona. On September 15, 2021, NaphCare and Pima County first entered into a contract whereby NaphCare agreed to provide comprehensive medical and mental health care to people in the jail for an annual fee of $17.8 million. Under that agreement, which was in effect through the entirety of Ms. Casey's relevant confinement, NaphCare committed to providing mental health and medical care "in a manner that meets or exceeds the standards of care of a reasonable, prudent health care provider in the community." Among its many specific obligations, NaphCare was expected to review every admitted patient's prior health records, complete mental health screenings and assessments for all arrestees, and to implement systems to determine each patient's most current or recent prescription medication regimen and ensure that regimen be followed. On October 1, 2022, NaphCare and Pima County renewed their contract with the County, agreeing to pay NaphCare $62.8 million over the next three years. Because NaphCare was providing a public function in overseeing and providing medical and mental health care in the Pima County Jail, it is a state actor for the purposes of 42 U.S.C. § 1983 and bound to follow the United States Constitution. It is also a licensed healthcare provider under Arizona law.

24.    Defendant **Pima County** is a municipal corporation, organized under the laws of the State of Arizona. Pima County is a "person" for the purposes of 42 U.S.C. § 1983. At all relevant times, Pima County owned and operated the Pima County Jail. The County was responsible for, among other things, (a) training and supervising jail employees; (b) adopting, implementing, and enforcing jail policies; (c) securing the provision of adequate medical and mental health care as required by law; (d) ensuring adequate staffing levels in the jail to provide for the health and safety of confined persons and to comply with legal requirements; (e) overseeing

all staff and subcontractors to provide medical and mental health care, including through regular investigation and quality control; and (f) making sure that the constitutional rights of detained persons are met, including with the provision of adequate medical and mental health care and access to their lawyers and the courts. Though Pima County entrusted NaphCare with day-to-day medical operations in the jail, its duty to ensure adequate medical and mental health care is non-delegable, such that it is liable for any unconstitutional policies, practices, or customs that resulted in harm to a person confined in the jail, including the unconstitutional policies, practices, or customs of NaphCare.

25.    Defendant **Chris Nanos** is the elected Sheriff of Pima County, Arizona. He was appointed to serve as Sheriff in 2015 and elected to the office in 2020. Sheriff Nanos is charged with overseeing the Pima County Jail, and in that capacity, acts as a final policymaker for the County. *See, e.g.*, Ariz. Const. art. XII, § 3. He is directed by law to "take charge of and keep the county jail." Ariz. Rev. Stat. § 11-441(A)(5). This year, a group of sheriff's deputies voted that they had "no confidence" in Nanos's performance. He is presently under criminal investigation by the Arizona Attorney General. His current term ends on January 1, 2025.

26.    Defendant **Jason Chamberlain, R.N.**, was, at all relevant times, a registered nurse employed by NaphCare who acted in the course and scope of his NaphCare employment vis-à-vis Mary Faith Casey. Defendant Chamberlain was acting under color of law by providing medical and mental health care—including initial screenings and assessments—to individuals confined in the Pima County Jail. He had a duty to ensure that all such medical and mental healthcare, including to Ms. Casey, met the requirements of the United States Constitution and other legal standards. Defendant Chamberlain is a licensed health care provider under A.R.S. § 12-561. He is sued in his individual capacity.

27.     Defendant **Leo Easley, N.P.**, was, at all relevant times, a nurse practitioner with prescribing authority employed by NaphCare who acted in the course and scope of his NaphCare employment vis-à-vis Mary Faith Casey. Defendant Easley was acting under color of law by providing medical and mental health care to individuals confined in the Pima County Jail, including Ms. Casey. He had a duty to ensure that such medical and mental health care met the requirements of the United States Constitution and other legal standards. Defendant Easley is a licensed health care provider under A.R.S. § 12-561. Defendant Easley is sued in his individual capacity.

28.     Defendant **Mikell Karsten, M.D.**, was, at all relevant times, the medical director of the Pima County Jail and employed by NaphCare. He acted in the course and scope of his NaphCare employment vis-à-vis Mary Faith Casey. Defendant Dr. Karsten was acting under color of law by providing medical and mental health care to individuals confined in the Pima County Jail, including Ms. Casey. He had a duty to ensure that such medical and mental health care met the requirements of the United States Constitution and other legal standards. Defendant Karsten is a licensed health care provider under A.R.S. § 12-561. Defendant Karsten is sued in his individual capacity.

29.     Defendant **John Samaan, M.D.,** was, at all relevant times, a prescribing provider[1] and medical doctor employed by NaphCare who acted in the course and scope of his NaphCare employment vis-à-vis Mary Faith Casey. Defendant Dr. Samaan was acting under color of law by providing medical and mental health care to individuals confined in the Pima County Jail, including Ms. Casey. He had a duty to ensure that such medical and mental health care met the

---

[1] Plaintiffs generally use the term "provider" to mean a medical doctor, physician assistant, or nurse practitioner who has the authority to issue prescriptions unless otherwise noted, i.e., when referring to a "licensed health care provider" within the meaning of Arizona's medical malpractice law.

requirements of the United States Constitution and other legal standards. Defendant Dr. Samaan is also a licensed health care provider under A.R.S. § 12-561. Defendant Dr. Samaan is sued in his individual capacity.

30.    Defendant **Matthew Woods, M.H.P.**, was, at all relevant times, a mental health professional employed by NaphCare who acted in the course and scope of his NaphCare employment vis-à-vis Mary Faith Casey. Defendant Woods was acting under color of law by providing mental health care to individuals confined in the Pima County Jail, including Ms. Casey. He had a duty to ensure that such mental healthcare met the requirements of the United States Constitution and other legal standards. Defendant Woods is a licensed health care provider under A.R.S. § 12-561. Defendant Woods is sued in his individual capacity.

## V.  FACTS

### A.    Mary Faith Casey's Background



*Figure 1:Mary Faith Casey (center) pictured as a child with two of her sisters.*

31.    Mary Faith Casey was born in Newton, Iowa, and raised in the San Diego area. She maintained close relationships with her four sisters, brother, and parents. Her surviving sisters describe Ms. Casey as the glue holding their family together. She sent birthday and holiday cards

COMPLAINT – Page 12

to each of her relatives every year. Her family describes her as having a magnetic personality and both physical and inner beauty.


*Figure 2: Ms. Casey as a young woman*

32.      Before her mental illnesses emerged, Ms. Casey was married to a tennis professional and co-owned her home. She enjoyed shopping, singing, and dancing with her children.


*Figure 3: Ms. Casey with her two children, Carlin (left) and Karina (right)*

33.      Mental illness began to play a significant role in Ms. Casey's life when she was diagnosed with bipolar disorder in approximately 1997. Around the year 2000, her mother

Phyllis—who herself had struggled with mental illness and addiction—died. Ms. Casey had been acting as her mother's caregiver, and the two were very close. Around this same time, Ms. Casey's marriage ended. These combined setbacks exacerbated Ms. Casey's mental health struggles, and she began to use drugs and alcohol to excess.

34.     Within a few years, Ms. Casey was without permanent housing—periodically living in shelters, recovery programs, and her sisters' homes. She lived this way in Southern California for approximately fourteen years. Homelessness exposed Ms. Casey to physical and sexual abuse, theft, and criminal prosecution. While this chapter of her life was difficult, Ms. Casey also experienced periods where, with supportive treatment, she would stabilize.

35.     Even while living in poverty, Ms. Casey was kind and generous. She was quick to give away even her last dollar to others who needed it.

36.     Ms. Casey left California to see her son Carlin in Tucson in February 2020. Unfortunately, given her mental health difficulties and substance use problems, Ms. Casey began living on the streets of Tucson by the spring of 2020.

37.     On October 25, 2020, Ms. Casey was experiencing delusions and got into a fight with a man named Emerson Clark. The exchange escalated, and Ms. Casey was charged with one count of robbery, a low-level (class four) felony.

38.     Shortly after her 2020 arrest, Ms. Casey was treated at the Sonora Behavioral Health Center from October 28th to November 10th, 2020. While there, Ms. Casey attended therapy, participated in a treatment plan, and, significantly, received a regimen of psychiatric medications that greatly helped her. Ms. Casey showed speedy, dramatic improvement upon receiving these medications.

39.    After being treated at Sonora, Ms. Casey was sent to the Pima County Jail in November 2020 to face prosecution for the robbery charge. She remained incarcerated for nearly nine months.

40.    Throughout her 2020-2021 incarceration (notably, before NaphCare became the jail's exclusive medical and mental health care provider), Ms. Casey received adequate medical and mental health care including all her necessary psychiatric medications. In contrast to when NaphCare oversaw her care, she did not deteriorate.

41.    On May 3, 2021, a court found that Ms. Casey was incompetent to stand trial but that her competency could be restored. On July 1, 2021, the court reversed course to find her competent to enter a guilty plea, and Ms. Casey pled guilty to a single count of aggravated assault. When she was sentenced on July 30, 2021, Ms. Casey told the Court that she was "very sorry for what happened [to] Emerson [Cl]ark" and that "I intend to do everything in my power to retain my cleanliness, my sobriety, and my mental health. At one time in my life, I was 17 years clean from drugs so I know that it's possible for me to do." She was sentenced to a term of 270 days in jail and 18 months' probation.

42.    On August 17, 2021, Ms. Casey was released from jail with a week's worth of her prescription medications. Upon her release, jail staff recorded Ms. Casey as being physically healthy, "medication dependent," and having a "normal" mental status. She weighed 189 pounds.

43.    Unfortunately, following her jail release, Ms. Casey's medications, along with her wallet, identification cards, phone, and other belongings, were stolen. She lived in a tent encampment and was exposed to violence and abuse.

44.    The terms of Ms. Casey's probation required her to maintain a residential address and pay a $64 monthly fee that she could not afford. Her poverty and homelessness made

compliance impossible. On April 6, 2022, a probation officer petitioned to revoke Ms. Casey's probation and arrest her because she "changed her residence without the prior approval of the [Adult Probation Department]."

**B.    Ms. Casey's 2022 Arrest and Initial Booking**

45.    On April 30, 2022, a security guard with the Butterfield Business Complex called 911 to ask police to remove two homeless people from the property's parking lot. Those two people were Ms. Casey and Manuel Iniguez Gonzalez. When police arrived, they discovered an outstanding arrest warrant for Ms. Casey due to her alleged "failure to abide by conditions of probation." She was arrested without incident, detained without bond, and taken to jail. From that point forward, she became exclusively and completely dependent on NaphCare and its staff for the medical and mental health care she needed.

46.    After her arrest, but just before being booked into jail, a NaphCare-employed Emergency Medical Technician screened Ms. Casey to determine whether she was medically appropriate for incarceration. The technician noted, significantly, that Ms. Casey "IS REQUESTING TO BE PLACED BACK ON PSYCH MEDICATIONS." (Emphasis in original.) That specific request became part of Ms. Casey's NaphCare medical record, viewable by all NaphCare employees from that point forward—during any medical encounter or otherwise. The technician also indicated that Ms. Casey was able to walk unassisted and speak without slurred or altered speech, and she was thus medically cleared for incarceration.

47.    Defendant Jason Chamberlain, R.N., assessed Ms. Casey upon her admission to the jail. Ms. Casey was in good medical health and mentally stable on April 30, 2022. Nurse Chamberlain reported her as "oriented" to person, place, time, and situation. She appeared "disheveled" but had "appropriate" perception. She was "alert, responsive, cooperative, but "depressed." Her "head, eyes, ears, nose, and throat" (HEENT) and vital signs assessments were

normal. Her breathing was "even, unlabored, and normal rate," and her heartbeat was regular. She was measured as 5'2" and 145 pounds and described as having a "medium" build. She tested negative for all drugs and alcohol upon screening. Nurse Chamberlain did not find Ms. Casey needed to be scheduled for an acute psychiatric appointment upon his initial physical assessment.

48.     Notably, however, while Nurse Chamberlain's notes in Ms. Casey's NaphCare "receiving screening" paperwork indicate that he was made aware of her "current or past treatment for mental health issues," *including* a prior treatment at Sonora Behavioral Health, the same notes show *no* inquiry by Nurse Chamberlain into her current or prior medications for her mental illnesses. Nor did he make any documented effort to determine what medications she might need or depended on in the past. This failure to inquire into her medication or mental health history was deliberately indifferent and fell below the standard of care for a reasonable nurse admitting a patient in these circumstances. Nurse Chamberlain's conduct was substandard particularly because he was (or should have been) aware of several indicators in Ms. Casey's case: (1) she asked to be put back on her psychiatric medications, (2) she had current or past treatment for mental health issues, (3) she had been treated at Sonora Behavioral Health, and (4) she had previously received a slate of psychiatric medications in the very same jail less than a year earlier, as shown in easily-accessible jail medical records.

49.     Indeed, despite (1) knowing that medication and mental health history screening was critical to avoiding decompensation in mental health patients, (2) clear NCCHC standards to so screen, and (3) its contractual agreement to follow NCCHC standards, NaphCare's medical intake forms *did not even contain* a field specifically asking about prescription medications for incoming patients. Due to this reckless omission on NaphCare's part—a clear breach of its committed obligation and the standard of care—Nurse Chamberlain's grossly inadequate "inquiry"

on this critical point started and ended with an offhand note that Ms. Casey was on "no meds currently." NaphCare and Nurse Chamberlain's failure to adequately screen Ms. Casey on admission or make any reasonable inquiry into her history caused her to go without needed medications—and to decline without them.

50.     Ostensibly in order to provide "continuity of care," Nurse Chamberlain had Ms. Casey sign a release form to provide jail staff with access to her medical records, *including* for previous "MENTAL HEALTH TREATMENT." (Emphasis in original.) But no one providing medical or mental health care in the jail took any action to seek, acquire, or review Ms. Casey's prior mental health records from Sonora. Nor did Nurse Chamberlain or any other NaphCare employee review the records readily available to them showing Ms. Casey's mental health and treatment history in the same jail less than a year earlier. Though health care staff, including Chamberlain, had actual knowledge of Ms. Casey's significant mental health history, no action was taken to obtain and review her records. This failure to obtain and review records constitutes a significant and deliberately indifferent omission and fell below the standard of care for a reasonably prudent nurse, particularly in view of NaphCare's contractual obligation to do so. This omission caused Ms. Casey to go without treatment, including prescription medications she badly needed.

51.     Due to her 2021 detention *in the same facility*, NaphCare and its employees had access to records of Ms. Casey's mental illnesses, knew that she was "medication dependent," and could easily have accessed a list of her previous mental health medications in the same jail less than one year earlier. Yet no efforts were made to review those records or identify, prescribe, or continue Ms. Casey on psychotropic medications upon her admission to the jail. This reckless and deliberately indifferent choice—which fell below the standard of care of reasonably prudent health

care professionals—subjected Ms. Casey to significant yet easily avoidable risks that ultimately proved life-ending.

**C.    Decline in the Jail Without Adequate Mental Health or Medical Care**

52.    Ms. Casey depended on mental health medication and consistently asked to be placed on her medications from the moment of her arrest and jail confinement. But, despite knowing or having reason to know of her history, Defendants deprived Ms. Casey of those important medications and made no serious efforts to remedy her resulting mental health symptoms. Predictably, her mental health condition deteriorated rapidly. One major symptom of her deteriorating mental health was a failure to sufficiently eat food or drink fluids. Consequently, Ms. Casey lost dramatic amounts of weight, became lethargic and largely bedridden, lost the ability to walk, developed bedsores, became incontinent, and suffered marked and dramatic deterioration in her overall physical and mental health. Ms. Casey was in dire condition and catatonic before Defendants or any NaphCare health care worker even *explored* providing her with antipsychotic medications, as described more fully below.

53.    Within the first three weeks of Ms. Casey's jail confinement, her failure to eat became manifest. On May 21, 2022, a corrections officer noted that Ms. Casey did not eat breakfast, lunch, or dinner.

54.    On May 23rd, Ms. Casey's public defender stated in court (in the absence of Ms. Casey) that she was "concerned that [Ms. Casey] has decompensated… [.]"

55.    Although Ms. Casey's mental health needs were apparent from the moment she was brought to the jail, she received no mental evaluation or treatment whatsoever for the first 26 days of her confinement.

56.    On May 26th, 26 days after she entered the jail, Defendant Matthew Woods finally performed an *initial* mental health evaluation of Ms. Casey. NaphCare committed in its contract

to provide such evaluations within fourteen days. Mr. Woods was not a prescribing provider, but his notes from that encounter indicate that he (and anyone else with access to Ms. Casey's records) could easily see that she had been "prescribed antidepressants and antipsychotics here [at the jail] in the past." Mr. Woods recorded a "goal" in Ms. Casey's treatment plan of "taking psychiatric medications daily as prescribed," but at this time, she was not prescribed or being offered any medications. Neither Mr. Woods nor anyone else made any effort to determine what those prior medications were, despite easily accessible records from her prior incarceration and treatment at Sonora Behavioral Health. Without attempting to expedite her care, Mr. Woods simply noted that Ms. Casey would "be scheduled with the [prescribing] provider" with no specific indication as to when that appointment would occur. This negligent and deliberately indifferent delay in care, and the other omissions described above, put Ms. Casey at substantial risk of serious harm and caused her condition to worsen. This was not inevitable: indeed, during his first evaluation, Mr. Woods described Ms. Casey's prognosis as "fair" because she was "engaged with good insight and desire for improvement," including goals of "regaining energy" and having the "ability to socialize again."

57.    As of June 5th, Ms. Casey had been in jail for 36 days without any medication or a visit from a mental healthcare provider. Her mental health by now was deteriorating significantly. On that date, another person with whom Ms. Casey was incarcerated initiated a sick call, a mental health call, and a dental visit all from the jail kiosk system on Ms. Casey's behalf. Of note, one of those requests stated that she had "*not been eating nor drinking*," and that she "feel[s] like I'm too far gone… [and] I need to be seen ASAP please" because "I feel miserable." This same day, a behavioral health staff member in the jail visited with Ms. Casey, who was "alert," "cooperative," and "able to communicate clearly" but requested help. The staffer made a note that Ms. Casey "is

not prescribed Rx [prescriptions] at this time." Yet again, however, no documented plan was made to prescribe or initiate medications, and no further action was taken to determine Ms. Casey's need for any.

58.     On June 6th, Defendant Mikell Karsten, M.D., prescribed a single "face to face triage" with Ms. Casey. It is not clear whether that triage encounter occurred, or if so, who provided it. Acting below the standard of care and with deliberate indifference, Dr. Karsten did not take prompt action to have Ms. Casey's medications reviewed, access her history, or have her seen by a psychiatric provider, causing further delay and decline. The next day, Henry Mallek, D.M.D., prescribed Ms. Casey ibuprofen. No other medication was prescribed or provided—and, still, no one made any effort to inquire into Ms. Casey's mental health or prescription medication history. Ms. Casey was able to take most of her offered doses of ibuprofen, thus indicating her ability and willingness to orally take medications offered to her at this time. But without her necessary psychotropic medications, Ms. Casey's serious mental health condition continued to worsen.

59.     By June 9th, Ms. Casey's mental health had grown even worse, and her failure to eat or drink was becoming increasingly evident. Ms. Casey's peers and the correctional officers supervising her reported that she was "not getting out of bed for extended times, *not eating, drinking*." (Emphasis added.) Ms. Casey mumbled indecipherably when a behavioral health specialist visited with her. She was moved to the jail's mental health unit at about 2 p.m. on June 9th.

60.     By the time a prescribing provider, Defendant Leo Easley, N.P., first saw her on June 12th, Ms. Casey had been incarcerated for six weeks and was continuing to decline in the absence of any mental health medications. Notably, June 12th represents the first time in her six-week confinement that *any* mental health professional with prescribing or diagnosing authority

had seen Ms. Casey. During this encounter, Ms. Casey clearly indicated to Nurse Easley that she "used to take psych medications" including Remeron and Lamotrigine (and the fuller slate of her prior medications was a matter of record). However, in a reckless omission, Nurse Easley made no effort to investigate the fuller slate of medications, failed to seek or review her prior records or history, did not adequately consider Ms. Casey's need for anti-psychotic medication, and only prescribed her a single antidepressant, 7.5 milligrams of Remeron (also known as Mirtazapine) once per day.

61.    Nurse Easley's failure to make reasonable inquiries about her history or prescribe Ms. Casey the fuller slate of medications she required, including an anti-psychotic, was deliberately indifferent and fell below the standard of care of a reasonably prudent provider. This was especially so given that, by now, available records documented Ms. Casey's failure to adequately eat or drink—a serious symptom of her mental decline that should have been a red flag to any reasonable provider in Nurse Easley's position. As a result of Nurse Easley's negligent and deliberately indifferent conduct, Ms. Casey continued to decline at great cost to her mental and physical health.

62.    Jail staff offer detained people periodic access to out-of-cell time in a "day room" where they can access showers, phones, and recreation. Throughout the months of June and July, Ms. Casey did not come out for any of her offered out-of-cell time—a fact that was documented in her jail records, accessible by NaphCare's medical and mental health staff, and a further indication of her deteriorating health.

63.    By June 18th, Ms. Casey had been in jail for 49 days without adequate mental health care or medications, and her failure to consume food and resulting lethargy was becoming evident to correctional officers. On this day, correctional staff recorded that Ms. Casey "*has not been*

*observed eating*" and has been "*completely inactive* in [her] cell." Again, these documented warning signs were available to NaphCare's medical and mental health staff. But they were ignored.

64.    A week after the stark warnings from correctional staff that Ms. Casey had not been observed eating and was completely inactive, and 56 days into her confinement, NaphCare employees finally made their first efforts to determine Ms. Casey's weight. Although Ms. Casey was recorded to weigh 145 pounds at her April 30th admission to the jail, when NaphCare staff weighed Ms. Casey on June 25th, she was only 106 pounds. The next day, she told a nurse that she was severely depressed (a "ten" on a scale of one to ten) and "not feeling good." Her dramatic weight loss in only 56 days was now plainly evident to any member of NaphCare's medical or mental health staff who simply chose to look at her record. But no one took any measures to investigate the cause of her dramatic weight loss or address the fact that she was not eating.

65.    Without adequate mental health care and having been deprived of her needed medications throughout May and June, Ms. Casey's failure to eat and the results of her inadequate nutrition became even more manifest. By July 3rd (now 64 days into her jail confinement), custody staff noted concerns in their records that "she is declining" because of her lack of appetite.

66.    On July 12th, Defendant Mikell Karsten, M.D., apparently now cognizant of Ms. Casey's significant reported weight loss, reviewed her records and stated that she had "lost approximately 100 pounds over the past year," (apparently getting this information from her recorded weight at the jail in 2021). Dr. Karsten suggested that Ms. Casey may need a chest x-ray, mammogram, and colonoscopy to rule out other potential causes for her dramatic weight loss. In other words, Defendant Karsten was acutely aware by early July that Ms. Casey was experiencing dramatic weight loss worthy of close investigation. He further recorded that Ms. Casey was

"withdrawn, quiet, doesn't make eye contact," and "mumbles any answers to the questions she responds too (sic)." Despite these symptoms, which should have raised alarm bells to a reasonably prudent medical professional, Dr. Karsten did not expedite psychiatric review of Ms. Casey; nor did he seek to make any inquiry into her psychiatric history or her lack of medications. These shortcomings, likely fueled by NaphCare's express written policy of avoiding referrals for off-site care to save costs (discussed more fully below), were deliberately indifferent and fell below the standard of care for a reasonably prudent doctor. The result was the continued decline of Ms. Casey's mental and physical health. Instead of attaching any urgency to Ms. Casey's evident problems, Dr. Karsten opted to simply "continue recommendations per mental health provider." But there were no such recommendations of note to "continue."

67.    On July 9th, Defendant Nurse Easley (having failed to follow up with Ms. Casey in any way since their encounter roughly four weeks earlier) noted that he "attempted to see" Ms. Casey twice on two different days but that she "refused to engage." Notwithstanding that her lack of engagement was a clear symptom of her worsening mental illness and declining overall health, Nurse Easley cruelly elected to "hold [her] psychotropic medications until more alert and responsive with a mental health provider." He then failed, *for more than a week*, to take any other action or even see his patient again. As a result of this deliberate indifference to Ms. Casey's clear and serious medical and mental health needs, which was also a significant breach in the standard of care, Ms. Casey continued to decompensate.

68.    Nurse Easley did not see Ms. Casey again until eight days later, on July 17th. By this time, she had been in jail for 78 days without adequate mental health care or necessary psychiatric medications. Ms. Casey was losing dramatic amounts of weight from failing to take in adequate nutrition and declining significantly in her mental and physical health. All of these

concerns were documented. During Nurse Easley's July 17th visit, he reported that Ms. Casey seemed "quite different" than she had in June: she remained lying in bed throughout their encounter, and her room was scattered with uneaten bags of food. He specifically recognized, and documented in striking terms, that Ms. Casey was suffering "*significant weight loss*" and was "*deteriorating.*" Nevertheless, in an inexplicable, outrageous, deliberately indifferent, and grossly negligent decision, Nurse Easley chose to *discontinue* Ms. Casey's single antidepressant medication and simply "follow up in 30 days." He took no other action of any kind, and, despite his full awareness of her drastically decompensating state, never followed up with his patient again. And in thirty days, Ms. Casey would be permanently discharged from the jail, her life beyond saving.

69.     Medical records, to which NaphCare medical and mental health staff had easy access, are replete with indications that Ms. Casey was not eating or drinking. Further, because corrections officers note that she often gave her food away to cellmates, these records likely *underestimate* the magnitude of Ms. Casey's starvation, i.e., because some notes suggest that food was eaten, but it was being eaten by other people.

70.     A mental health staff member noted on July 21st that Ms. Casey was not suicidal but did need "ongoing support." But the support she received, a cursory weekly mental health visit, was entirely inadequate.

71.     As the days went on, Ms. Casey continued to decline, weaken, and become enfeebled. On July 24th, a NaphCare nurse noted that Ms. Casey "appeared anxious, rocking back and forth while seated at [the] start of [the] evening shift 7/23/22." She "had difficulty verbalizing her thoug[h]ts, but nodded her head in a 'yes' motion when asked if she ne[e]ded help and appeared to be responding to internal stimuli." These records would signal to any reasonable healthcare

professional that Ms. Casey wanted help but was simultaneously experiencing cognitive impairment that was interfering with her ability to function.

72.     By late July, Ms. Casey, having entered the jail in a generally robust state of health and with a full ability to ambulate normally, was so emaciated and weak that she was now in a wheelchair. According to reports of corrections officers, accessible by medical and mental health staff, she was continuing to "*eat[] very little daily*." On July 30th, a concerned corrections officer made further note of the fact that Ms. Casey had "been refusing to eat on multiple shifts for multiple days" and that despite being on "double portions for her weight," she "has not been observed eating at all." The officer was concerned about Ms. Casey's "frail stature and limited mobility," which starkly contrasted with her presentation and "medium build" when she first entered the jail. The officer reported these concerns to a NaphCare employee, Nurse Richey, who said she would "notify the provider and submit another weight check." But this did not promptly occur. Records from this exchange further reveal that NaphCare indicated it "was aware that [Ms. Casey] *has refused to eat previously and had a weight check request,"* but corrections staff *"did not know if she was followed up with*."

73.     Indeed, while NaphCare staff occasionally weighed Ms. Casey, these measures did not occur with regularity, and therefore NaphCare staff could not keep accurate track of her declining weight. Nor did NaphCare staff initiate any food or fluid logs until August 2022. The failure to quickly institute these basic steps for a patient who was known to have stopped adequately eating or drinking, and was losing dramatic amounts of weight, was deliberately indifferent and grossly below the standard of care. This failure further facilitated Ms. Casey's decline.

74.     Throughout her decline, there are records of Ms. Casey "refusing" medications, food, water, day room time, and legal visits. These "refusals" were not conscious, informed decisions. Rather, "refusal" was the parlance of NaphCare and Pima County employees whose practice was to record a "refusal" if a patient did not engage with an encounter in the expected way, even if due to mental or physical illness. These documented "refusals" (i.e., failures to engage) were a natural symptom of Ms. Casey's extreme weakness, frailty, severe unmanaged mental illness, and inability to undertake conscious decision-making—not an intentional attempt on Ms. Casey's part to stymie her care. Numerous health care workers, including those employed by NaphCare, recognized this. For example, on August 9, 2022, Defendant Woods noted that Ms. Casey's "minimal… engagement" was "a result of her physical weakness" rather than a conscious "refusal to engage." Other doctors and nurses observed on multiple occasions that Ms. Casey "did not have capacity" to refuse medications or other medical care.[2]

## D.    Inability to Access Court or Counsel or Communicate with the Outside World

75.     By at least July, and likely weeks earlier, Ms. Casey's mental and physical condition had deteriorated to the point where she was rendered unable to access her counsel, participate in court proceedings, or communicate with her loved ones. She was thus completely shut out from the outside world and unable to make her condition and needs known to anyone outside the jail. Ms. Casey was rendered too sick to meet with her public defender, Ms. Edminson, by at least July 2022. Ms. Edminson attempted to visit Ms. Casey at the jail multiple times, but given her weak condition and unmanaged mental illness, Ms. Casey became unable to receive legal visits. As Ms. Edminson stated in one court hearing that she was forced to attend without her client, though "the

---

[2] Indeed, as noted elsewhere, the court presiding over Ms. Casey's criminal case believed she lacked the mental capacity to proceed with prosecution. For good reason, this finding should have triggered additional protocols in her mental health care under NaphCare's contract. But even in the face of this competency finding, NaphCare did not change its approach to Ms. Casey's care.

reasons I've been getting from the jail is that she is refusing… it [i]s clear that she has been deteriorating."

76.     Indeed, by causing Ms. Casey to suffer such a decline that she could not be seen by her own lawyer, Ms. Casey was now captive inside the jail with no method of making her condition known. And Ms. Edminson would have otherwise been able to advocate for Ms. Casey not only in her criminal case, but also perhaps more crucially with respect to securing alternative assistance for her mental and physical health needs.

77.     Relatedly, Ms. Casey was too weak, frail, and unstable to be transported to court. She accordingly was unable to attend court dates on May 24, July 25, and August 11, 2022—thus losing critical opportunities to participate in her own defense or make her condition known to court officials who could order measures to address her lack of care. By depriving Ms. Casey of her right to counsel and the courts, NaphCare effectively held her hostage. Ms. Casey was thus further rendered incapable of making her needs known to anyone but the very NaphCare staff members who, through their neglect and indifference, caused her condition in the first place.

78.     The effect of denying Ms. Casey access to her lawyer or the court was devastating. When a judge and her public defender finally saw her for the first time in over three months on August 16th, they took immediate and emergency action to get her released to a hospital. Unfortunately, those measures, which would have come much earlier had she been able to show herself to her lawyer, the judge, or others outside the jail, came too late.

79.     Just as Ms. Casey's mental and physical deterioration rendered her incapable of accessing her counsel and the courts, her dire state also rendered her incapable of exercising her First Amendment right to communicate with her loved ones or anyone else through mail or other means. When Ms. Casey had been incarcerated on other occasions, she regularly used the mail to

correspond with her family members. But her mental faculties became so compromised from her constant neglect that she lost the ability to do so through the summer of her 2022 jail confinement. Ms. Casey was thus unable to alert her children, sisters, or anyone else about her needs, and those people were left unaware of her dire condition and incapable of assisting her.

80.    Without her knowledge (having been rendered too compromised to appear in court), on July 25th, a court found Ms. Casey to be mentally incompetent to face further prosecution and sentencing for her probation violation, but restorable. Though such a finding should have triggered additional mental health care from NaphCare (as outlined in NaphCare's contract), NaphCare took no action with respect to her now officially declared incompetence.

**E.    Hospitalizations and Continuing Decline**

81.    Ms. Casey was briefly hospitalized three times before finally being discharged from the Pima County Jail to die. The first such hospitalization occurred on August 4, 2022—at which point she had been in the jail consistently deteriorating, both mentally and physically, for 96 days.

82.    At about 10:30 a.m. on August 4th, Ms. Casey's cellmate(s), having grown deeply concerned about her, flagged down a corrections officer. Ms. Casey's cellmate of four days said that she had not once observed Ms. Casey eating or using the toilet. Correctional officers checked on Ms. Casey and found that she "kept pointing to her throat and chest" but "appear[ed] too weak to use verbal speech" and "could not talk" even after trying to open her mouth three different times to speak. Corrections staff thus sent Ms. Casey to the medical unit via a wheelchair for examination.

83.    Less than thirty minutes later, and without speaking to her cellmate or others who had observed her lack of food or toileting in the days prior, NaphCare staff inexplicably sent Ms. Casey *back* to her cell, stating—bewilderingly—that her vitals and appearance were "stable-*ish*." (Emphasis added.) NaphCare staff then cleared Ms. Casey to return to the cell from which she had

just come. A corrections staffer, Officer Lacaillade, recorded that they "spoke to mental health and expressed their concerns with [Ms. Casey's] safety and wellbeing." But NaphCare staff refused to take seriously the concerns of first-hand observers of Ms. Casey's state or engage with her compromised physical and mental condition—a deliberately indifferent decision that caused further delay of any possible life-saving intervention.

84.    At some point later that day, NaphCare's Western States Medical Director Elliot Wade, who is not based in Tucson, completed emergency room referral paperwork for Ms. Casey. Dr. Wade noted that "*concerns for [Ms. Casey's] oral intake have existed since June 8, 2022*" (i.e., for at least *57 days under NaphCare's watch*) and that records revealed "significant weight loss," and failure to thrive. Ms. Casey was finally taken to the Banner University Hospital's Emergency Room with Dr. Wade's authorization.

85.    Ms. Casey was weighed both at the jail and the hospital on August 4, 2022. At the jail she weighed 76 pounds (though she was being held up by two people to be measured due to her frailty), and at the hospital, she was recorded as weighing 35.9 kilograms, or 79 pounds. Assuming the hospital weight is accurate, this reflects a loss of approximately 66 pounds of body weight in the 96 days from her April 30th admission to the jail—an average of approximately 2/3rds of a pound lost per day.

86.    While at the hospital on August 4th, Ms. Casey received intravenous transfusions and medications. Hospital staff x-rayed her chest, conducted CT scans of her head, chest, abdomen, and pelvis, ran an EKG on her heart, and ordered an MRI scan of her abdomen. These tests were ordered "to rule out underlying pathology," and came back "unremarkable." In other words, medical staff wanted to determine if Ms. Casey had some kind of underlying physical medical

condition causing her substantial weight loss, such as cancer or other physical pathology, and found that she did not.

87.    Healthcare workers at Banner were able to rehydrate and stabilize Ms. Casey through intravenous medications, water, and electrolytes. However, because the role of the hospital's emergency department is not to provide ongoing care, and the because the causes of Ms. Casey's weight loss were not strictly medical, she was returned to jail two days later on August 6, 2022 with instructions to "follow up with onsite provider and mental health." A note from a NaphCare nurse on August 6th simply stated: "HOSPITAL RETURN, NO NEW MEDS, UNKNOWN CAUSE." Banner Hospital did not know (as NaphCare made no effort to inform it) how long Ms. Casey had been in the jail, how long she had been deteriorating in the jail, the course of her deterioration in the 96 days leading up to that point, the extent of her jail neglect, her lack of necessary psychiatric medication, or anything about her jail medical or mental health history leading up to the point of her hospital visit. Banner discharged Ms. Casey under the mistaken (but reasonable) assumption that Ms. Casey was receiving and would continue to receive standard of care treatment and medication by the jail's on-site psychiatric staff (about which the hospital naturally knew nothing).

88.    Back at the jail, Ms. Casey was observed on August 6th "laying on her bunk" with "several packages of unopened food/snacks at her reach." She appeared "thin" and "older than [her] stated age." A mental health nurse, Tikeisha Pendleton, noted that "it appears that her psychiatric medications have been discontinued," but rather than addressing that limitation, and despite her "lack of improvement in… nutritional consumption [or] overall wellbeing," NaphCare's plan of care for Ms. Casey was simply and shockingly, to "continue to monitor." Ms. Casey cried throughout the night of August 6, 2022.

89.     By August 7th Ms. Casey had been in the jail for 99 days. Her condition had deteriorated so dramatically by this point that she was now suffering from bowel and bladder incontinence (her muscles physically unable to retain her own waste) and needed diapers. Due to her inability to move, and her by-now gross emaciation, she also had pressure sores on her hips where her bones protruded from her body. This was caused by her lying in one place without attention for hours on end. She was "extremely agitated" and in great distress.

90.     Ms. Casey was taken to the hospital a second time for a few hours on August 8, 2022 because her "oxygen saturation [wa]s decreasing" and her "skin [wa]s cool and clammy." She was treated by the emergency department at St. Mary's Hospital, where hospital staff once again ran a series of tests to try to determine whether there was a physical cause of her malnutrition and failure to thrive. They found no "acute findings" to suggest any other cause than her mental illness. Once again, NaphCare did not inform hospital staff how long Ms. Casey had been deteriorating in the jail or anything about her jail medical or mental health history leading up to the point of her hospital visit. Upon again receiving fluids and medication to stabilize her via IV in the hospital, Ms. Casey showed "significant improvement," and she was discharged to the jail again under the mistaken (but reasonable) assumption that Ms. Casey was receiving and would continue to receive standard of care treatment and medication by the jail's on-site psychiatric staff.

91.     For the next day or two after her August 8th hospital stabilization, Ms. Casey ate food. But this proved temporary and fleeting. After a day or two, Ms. Casey's food consumption dropped again.

92.     By August 9th, Ms. Casey continued the dramatic decline in her physical and mental health. It was against this backdrop—101 days into her jail confinement, having been hospitalized twice, rendered incontinent, exhibiting bedsores, and now in an exceedingly fragile state—that

NaphCare *first* offered Ms. Casey a fuller slate of mental health medications. These included Abilify (an antipsychotic), Lamictal (for bipolar disorder), Remeron (the antidepressant she had been previously taking), and Trazodone (for major depressive disorder). This fuller slate of medications should have been offered many weeks earlier, long before Ms. Casey reached this level of medical and mental health fragility.

93.     On August 9, 2022, Defendant Dr. John Samaan, a psychiatrist with prescribing authority, saw Ms. Casey for the first time. To this point, NaphCare had never had Ms. Casey evaluated by *any* psychiatric doctor. When Dr. Samaan saw her, he noted that Ms. Casey appeared "disheveled" and "mildly unkempt" and that her cell was "messy" with "debris and food all over." Dr. Samaan reported that Ms. Casey was "catatonic," "drowsy," "lethargic," "sluggish," and "STILL NOT EATING." (Emphasis in original.) When Dr. Samaan went to assess Ms. Casey, she was "laying on [her] cot, mumbling words to herself," "was barely [alert] and [oriented] to person and place NOT TIME," and was "very lethargic and obtunded [i.e., very reduced in her alertness]." Dr. Samaan concluded that Ms. Casey "may be in a CATATONIC state from either her depression or her schizophrenia or from both." (Emphasis in original.) In sum, Ms. Casey had reached a critical point of medical and mental health fragility, which would not have occurred had Ms. Casey received proper care earlier. And it was only after she had been confined for 101 days, severely malnourished, and rendered feeble, fragile, incontinent, and suffering from bedsores, that any NaphCare provider diagnosed what should have been diagnosed weeks or months earlier. Ms. Casey was schizophrenic. But her schizophrenia had gone untreated for so long and taken such a severe toll on her physical health that her chances of recovering were now greatly reduced.

94.     Dr. Samaan recognized that due to her fragility and difficulty eating or drinking, Ms. Casey would have trouble orally receiving the slate of medications she had so badly needed

for so long. Indeed, his orders to other NaphCare staff explicitly warn that "there may be some refusal of meds." However, instead of promptly trying intramuscular injection for these new medications (which he noted may be necessary), IV administration (which had helped her tremendously when she received it at the hospital), or orally dissolvable pills (which she later accepted at the hospital), he instead ordered medical staff to attempt to "crush and float" Ms. Casey's medications (dissolve them in water). But no health care staffer made *any* documented efforts to crush and float these medications as ordered, and Ms. Casey thus largely did not receive them. Moreover, Dr. Samaan knew that Ms. Casey was having difficulty swallowing, and so the "crush and float" instruction was insufficient to ensure she received her medication.

95.      Despite the considerable number of newly prescribed medications and Ms. Casey's acute, fragile, and possibly catatonic state, Dr. Samaan did not schedule a follow-up appointment with her, instead claiming in a note that she was "aware of how to request services as needed." This claim—wholly galling in the face of Dr. Samaan's contemporaneous documentation that she was catatonic, barely alert, and in the face of records that she could not communicate—was false. Ms. Casey had no awareness or ability of "how to request services as needed," and a reasonable doctor would have known that a patient in Ms. Casey's state was too confused, disoriented, and weak to advocate for her own health care needs. Then, incredibly, Dr. Samaan made no plan to follow up with Ms. Casey. He did not attempt to see his patient again at any time in the hours or days that followed. Dr. Saaman's conduct and omissions were deliberately indifferent, below the standard of care, and caused Ms. Casey to further decline from an already precipitous state.

96.      Defendant Woods also visited Ms. Casey on August 9th. His notes indicate that she appeared frail, "weakened," and that he was concerned about her. Consistent with her paranoid

and delusional state, Ms. Casey managed to tell Mr. Woods that she was afraid that her food was poisoned.

97.    By August 10, 2022, Ms. Casey, due to her moribund status, had developed an open wound on one of her bedsores and was found soaked in her own urine. A jail staff member found her "laying in a puddle of piss" but indicated that she would not "even try to get up."

98.    On August 11, 2022, Ms. Casey managed to tell a NaphCare behavioral health nurse that she "can't walk," "cannot swallow," is "stuck," and was having nightmares. She was so dehydrated that she was "licking her lips to get moisture before talking," and her breathing was labored. Her oxygen saturation levels were 83 percent, a dangerously low reading. Though she was scheduled to appear in court, Ms. Casey was too weak to do so. Instead, she was transported to St. Mary's hospital for her third hospitalization in the span of a week. She yelled and cried as she was taken away.

99.    At the hospital, Ms. Casey was found severely distressed. She was restrained, and again given an IV to replenish her electrolytes, which were depleted from dehydration and malnutrition. Consistent with the emergency department's role to stabilize and then release, hospital staff discharged Ms. Casey back to the jail a day later. They did so under the assumption that Ms. Casey was receiving mental health treatment and medication in the jail, noting that "they have their own psychiatrist" there. Hospital workers were ignorant of NaphCare's gross and continuing indifference and neglect of its patient up to this point. Upon returning Ms. Casey to jail a third time, hospital staff noted that she was "medically cleared for incarceration but *needs psychiatric evaluation*." (Emphasis added.) Yet, despite these discharge instructions, no NaphCare psychiatrist or other psychiatric provider bothered to visit her upon her return to the jail or in the days that followed.

100.     In court on that same day, August 11th, deprived of an opportunity to see her client, Ms. Casey's public defender told the presiding judge that "it's apparent that she's decompensating in custody" and criticized the prosecutor's office for its delays in initiating civil commitment proceedings to get her to a hospital.

101.     Ms. Casey was returned from the hospital to the jail a final time on August 12, 2022. Her mental condition had reached the point where she would "push [the nurse's] hand away" when offered water and was heard yelling the phrases "I can't, I can't!" and "it's horrible, REALLY BAD!" throughout the night. Delusional, suffering from bedsores, weak, and incontinent, she sat in a soiled diaper but, consistent with her delusional state, did not want to be touched.

102.     On August 14, 2022, Ms. Casey was once again found screaming, confused, and laying in a soiled diaper. Once again, NaphCare nurses noted in a familiar refrain that they would "continue monitoring" her.

103.     On August 15, 2022, a nurse recorded that Ms. Casey's skin was "tenting," a sign of severe dehydration. She moaned throughout the day and night.

## F.     Court Appearance on August 16, 2022

104.     By August 16, 2022, Ms. Casey had been confined in jail for 108 days. Due to her mental and physical state leading up to this point, she had been unable to attend any court hearing, access her counsel, or communicate with anyone outside the jail since May 5th—a period of 103 days. Ms. Casey was brought to court in a wheelchair. Presiding Judge Howard Fell and public defender Edminson, having not laid eyes on her for more than three months, were shocked by her emaciated, feeble, and sickly appearance. Ms. Edminson stated that Ms. Casey was a mere "shell" of the person she was three months earlier and feared that she "looks like she's dying."

105.     Only as of a hearing on August 16th could Ms. Casey's attorney, the prosecutor, and the judge appreciate what had happened to her during her time under NaphCare's watch. Even as

laypersons with no medical training, it was startlingly obvious to them that Ms. Casey was in dire medical and mental health straits. In an effort to save Ms. Casey's life, the case therefore transitioned on the spot from criminal to civil—the prosecutor immediately dismissed the criminal case that had caused Ms. Casey to remain in jail, and the public defender created a plan to discharge Ms. Casey to a hospital. The judge, deeply concerned about Ms. Casey, instructed Ms. Edminson to "see what you can do." These rapid steps to get outside treatment for Ms. Casey's dire condition were taken only now because it was Ms. Casey's presence at this court proceeding that illuminated her suffering to the first justice system personnel to have seen her outside the jail since early May.

106.    Ms. Casey's family, having been kept in the dark about their loved one's weeks-on-end suffering and deterioration, were first notified of her condition by Ms. Edminson on August 16th. Indeed, despite considerable efforts to communicate with her during her incarceration, including writing letters and sending items to her commissary account, neither Ms. Casey's sisters nor her children had heard from her or received any information about her condition. Neither NaphCare nor Pima County ever sought to reach out to Ms. Casey's family, despite their exclusive, first-hand knowledge of her weeks-on-end deterioration.

## G.    Discharge to Banner Hospital

107.    August 17, 2022, marked Ms. Casey's final day in the Pima County Jail. She could not respond to questions, roll over, take a sip of liquid, get her diaper checked, or even "acknowledge[] [that] she is human." Effectively doomed, she was found to weigh 91 pounds—a loss of 54 pounds (or nearly 40 percent of her entire body weight) since her confinement began 109 days earlier.

108.    On August 18, 2022, the 110th day of her jail incarceration, Ms. Casey was finally discharged in an ambulance to Banner Hospital after the court expediently approved an emergency motion filed as a last-ditch effort to potentially save her life. Upon her arrival at the hospital,

medical staff found her short of breath, agitated, physically wasting, and extremely cognitively impaired. Banner staff determined that her wasting was "psych[iactric] in nature," i.e., not caused by any other "medical etiology." Though she began to immediately receive psychiatric care, Ms. Casey's physical health was so fragile, weak, and unstable that she could not leave the medical wing of the hospital.

109.    Two of Ms. Casey's sisters, Michelle Cauble and Kaj Miller, traveled from California to Tucson as quickly as they could. When they saw their sister, her appearance shocked and traumatized them. They did not recognize her but characterized her appearance as that of a famine victim.



*Figure 4: Ms. Casey at Banner Hospital*

110.    While Ms. Casey received comprehensive medical and psychiatric care at Banner Hospital, particularly with her family's support, these interventions came too late. Her 110 days of starvation under NaphCare's watch caused her to reach the point where her outside caregivers

worried about "refeeding syndrome." Refeeding syndrome is a deadly phenomenon—first widely recognized among liberated prisoners of war and concentration camp survivors—in which a severely malnourished person begins to receive excess calories again (whether with assistance or otherwise) after a long period of starvation, leading to metabolic and electrolyte shifts that cause respiratory or cardiac failure, seizures, or comas.

111. Ms. Casey was severely malnourished and delusional upon her final admission to Banner Hospital. Her mental health had been neglected for so long in the jail that she believed that visiting family members were robots or clones. She was so traumatized and delusional from her jail experience that she feared that guards from the jail would come to the hospital to take her back.



*Figure 5: Ms. Casey in her hospital bed with her sister, Kaj Miller, visiting.*

112. Ms. Casey and her family were left with very few options. A feeding tube would have been an invasive option that was painful and risky, particularly because a patient in Ms. Casey's state of delusion and distress would likely rip it out. To be successful, such a tube would

need to stay in her nose for months. This procedure would have likely caused Ms. Casey agonizing pain and discomfort. Ms. Casey's family opted instead for a puree/thin liquid diet, based on an occupational therapist's assessment that she could still swallow.

113.    Two different psychiatric doctors, Stephanie Jarvie, M.D., and Terry Platto, M.D., evaluated Ms. Casey in early September. They both found that she was severely depressed, delusional (believed she no longer had a stomach), and suffering from severe malnutrition from her lack of food during her time in jail. Both doctors considered the possibility of electroconvulsive therapy, but Ms. Casey's medical caregivers and a hospital bioethics committee determined that she was too medically fragile to withstand the treatment.

114.    Dr. Platto noted that Ms. Casey's malnutrition was "a direct result of her severe depression with psychosis" and "confidently ruled out" other causes of her medical problems. The doctor concluded that Ms. Casey was "suffering immeasurable mental and emotional harm… without psychiatric treatment as evidenced by the severity of her depression and her belief that she is worthless and undeserving of care."

115.    Once it became clear that Ms. Casey could not tolerate ECT treatment, her family, medical staff, and the BioEthics committee at Banner Hospital concluded that "further medical or psychiatric intervention" was "medically futile." She was discharged to her family's hospice care on September 22, 2022.

**H.    Final Days**

116.    After leaving the hospital, Ms. Casey was transported to San Diego in a van rented by her family members so that she could spend her final days in the physical company of her loved ones. She rode in the back of the van along with her daughter, Plaintiff Karina Kepler, and her sisters Michelle Cauble and Kaj Miller. The family was warned by hospital staff that given "her

frailty," Ms. Casey was "unlikely to live much longer and could even die during transport to San Diego."



*Figure 6: Ms. Casey loaded into the van transporting her to San Diego*

117.    Ms. Casey survived the trip to San Diego, but then died, surrounded by family, on October 6, 2022.

***



*Figure 7: Ms. Casey on her deathbed*

## I.    Ms. Casey's Pain, Suffering, and Losses

118.    Ms. Casey suffered immeasurable physical and emotional pain over a period of five months—from April 30, 2022, until her death on October 6, 2022. Isolated in jail and rendered too sick to communicate with family, visit her lawyer, attend any court appearance, participate in her own legal matters, or make informed decisions about her care, Ms. Casey cried, moaned, withdrew, lost all hope, wasted away, lost her bodily integrity, and suffered innumerable indignities. By the time her family was able to be with her, her untreated mental illness and physical weakness made any final moments of reconciliation or mutual affection impossible.

119.    Ms. Casey also lost the chance to live out the remainder of her life—to achieve her stated goals of regaining energy, maintaining her mental health, and connecting with friends and family.

120.    On information and belief, Ms. Casey's estate accrued considerable hospital bills from her extended stays at Banner University Medical Center and St. Mary's Hospital in Tucson and for her hospice care during her final days.

**J.    Losses to Plaintiffs Casey and Kepler**

121.    Ms. Casey's surviving children, Carlin Casey and Karina Kepler, lost their mother, with whom they had maintained loving bonds notwithstanding her mental illnesses.

122.    Ms. Kepler remembers her mother as vivacious and generous, especially her loving and supportive presence during the birth of Ms. Kepler's first son. Up until her final, fatal incarceration, Ms. Casey would frequently send her daughter letters and cards, even from jail during earlier periods of incarceration, expressing her love and support. She has been damaged and victimized by the loss of her mother.

123.    Mr. Casey idolized his mother in his youth and loved shopping, singing, and dancing with her. Even when she struggled with addiction and mental illness, Mr. Casey leaned on his mother for support and wanted to be with her. He stayed in touch with her to the best of his ability even during her difficult periods of homelessness in Tucson. He cherishes a bible that Ms. Casey gave him with a loving inscription on the cover. He too has been damaged and victimized by the loss of his mother.

## VI. THE SYSTEMS, POLICIES, PRACTICES, AND CUSTOMS THAT ENABLED MS. CASEY'S DEATH

124.    If what happened to Ms. Casey was publicized to have happened in a North Korean or Russian jail, principled people of the world be outraged and attribute the events to a morally

corrupt government. So how and why did this happen in a large, modern American jail? To be sure, the individually named defendants acted below the standard of care and exhibited deliberate indifference to Ms. Casey's serious needs. These individual and collective failures contributed to and caused Ms. Casey's suffering and death. But it was NaphCare—acting on behalf of Sheriff Nanos and Pima County—that set the stage for all of these failures through its unconstitutional policies, customs, and practices. NaphCare accepted considerable compensation in order to operate as the sole and exclusive medical provider to people confined in the Pima County Jail. NaphCare's decisions represent the overarching, moving force behind Ms. Casey's gross neglect for weeks on end, and her resulting anguish and demise.

125.    Simply put, NaphCare put profits over people. In its desire to secure the Pima County Jail contract, make money, grow its business, outflank its corporate competitors, and ultimately enrich its owners, NaphCare neglected to ensure that its policies, customs, and practices were sufficiently robust to provide constitutionally adequate care for the nearly 2,000 people confined in the Pima County Jail. Ms. Casey's neglect and her suffering and death were predicable consequences of NaphCare's shameful and illegal failures. Those systemic failures took several forms, including: (a) a lack of on-site leadership at the Pima County Jail; (b) a woefully deficient staffing model; (c) a widespread custom, policy, and practice of failing to screen patients for their medication histories, including psychotropic medications; (d) a widespread custom, policy, and practice of failing to obtain or review patient medical records; and (e) a widespread custom, policy, and practice of failing to provide mental health care in a timely manner.

**A.    NaphCare Put Profits Over People, Conducting Its Pima County Operations with a Dearth of Critical Leadership**

126.    Beginning on September 15, 2021, Pima County entrusted NaphCare, a private for-profit corporation, with the provision of "comprehensive physical and mental health services" for

the population of the jail where Ms. Casey was confined. Pima County agreed to pay NaphCare $17.8 million for a single year of services, which included the period of Ms. Casey's confinement.

127.    When Pima County hired NaphCare, it did so through a "direct selection" process, i.e., without a request for proposals or any kind of competition from other companies. Pima County hired NaphCare after a high-profile, $700,000 settlement between NaphCare and the United States government based on credible allegations that NaphCare violated the False Claims Act. NaphCare thus had a known history of fraudulent conduct.

128.    In exchange for millions of dollars, NaphCare agreed that it would provide health care to all people incarcerated in the jail "in a manner that meets or exceeds the standard of care of a reasonable, prudent health care provider in the community." NaphCare, paradoxically, agreed to meet this standard of care while simultaneously admitting that it had an express policy of doing so only in the context of "cost containment" including, for instance, that it would "make every effort to treat patients with serious medical conditions" in the jail "rather than sending patients to offsite providers."

129.    In a memo from the Pima County Administrator, Jan Lesher, dated November 7, 2023, Pima County stated that "NaphCare has struggled to meet the contracted staffing requirements since their engagement" and that the company had "performance issues" due to "the lack of permanent on-site leadership." These observations were true, and there was a lack of adequate on-site leadership during the time of Ms. Casey's 2022 confinement. There was, in particular, considerable turnover in the position of NaphCare Medical Director, Chief Psychiatrist, and Mental Health Director, with County officials noting that the "mental health director position… proved to be the most challenging to fill." In other words, for large stretches of time, there was *no* Mental Health Director for the Pima County Jail. NaphCare's deliberately indifferent

failure to provide adequate staffing, including essential leadership, meant that progress in improving mental health care in the jail from its already feeble levels was "stalled" between July and September of 2022: the same time Ms. Casey was declining in jail.

130.    Lesher further identified NaphCare's systemic failure to provide "at least one staff member in a leadership position present for both medical and behavioral health" between 8:00 a.m. and 5:00 p.m. Monday through Friday. This failure to provide jail staff and patients with even minimum on-site leadership reflects NaphCare's deliberate indifference, prioritizing cut-cutting over patient care.

131.    Instead of providing critical, on-site leadership, which was necessary to ensure adequate patient care at the jail, NaphCare made its "corporate support personnel" available to the Pima County Jail in a purely remote capacity. Further, rather than ensuring adequate, qualified staff were available on-site, NaphCare relied on a telehealth service to supposedly staff the jail with enough nurse practitioners to support the needs of the jail population.

132.    In this vacuum of leadership, medical personnel in the jail were left without support to address Ms. Casey's acute and growing needs. This meant that no one with executive decision-making authority was on-site to triage Ms. Casey's care, to expedite her appointments, to make certain that a prescribing provider was working with her, or to refer her to a longer-term care solution out of the jail. The staff that *was* on hand lacked the leadership authority to override NaphCare's policy of treating Ms. Casey in-house (delaying her hospital treatment) and were all-too-often left with limited options such as "continue to monitor" or "follow up in 30 days." The time that was wasted without necessary on-site leadership proved critical to Ms. Casey, who needlessly lost her life due to NaphCare's deficient staffing model.

**B.    NaphCare Knowingly and Recklessly Short-Staffed the Pima County Jail, Particularly for Mental Health Needs**

133.    NaphCare also grossly understaffed the jail, particularly its mental health staff. Removed from the actual, on-the-ground practices in Pima County, the company further failed to police the customs and practices of its personnel. Adequate patient care was bound to suffer under this model. All of this was done by NaphCare with deliberate indifference to the needs of the jail's patient population.

134.    In making the contract with Pima County, NaphCare did so on a fixed basis—i.e., at a set annual amount with no (or limited) opportunity for upward adjustment in the $17.8 million annual fee. To profit from that contract, as was its natural aim, NaphCare knew it would have to keep its expenses significantly lower than the contract price. And because the overwhelming bulk of NaphCare's expenses are the labor costs of its medical and mental health staff, NaphCare deliberately understaffed the jail—knowing that, while this would guarantee a profit, the staffing would also be insufficient to provide for the needs of the patients who had no choice in the matter.

135.    NaphCare knew that it was committing to serving a rotating population of approximately two thousand detainees in the Pima County Jail—many of whom would have serious mental health needs and regular need for psychiatric care. To profit from its contract, however, NaphCare implemented a mental health staffing matrix that was grossly insufficient for the mental health needs of the jail's population. The official contract called for a single psychiatric nurse practitioner for the general jail population (working 87 percent of full-time). Acute mental health patients were to be served by a single psychiatrist working 15 hours per week, a single psychiatric nurse practitioner working 16 hours per week, and a psychologist working half-time. The sub-acute mental health population was to be served by providers only working half-time. This staffing decision represents a deliberately indifferent official policy decision by NaphCare

policymakers with final authority over mental health and medical care in the Jail. It was impossible to ensure sufficient care with such a low staffing level. And Pima County and Sheriff Nanos agreed to allow NaphCare to become the sole and exclusive provider of care at these low staffing levels.

136.    NaphCare chose to adopt a 12-hour work shift for its employees instead of eight-hour shifts. This decision was explicitly made to cut costs and secure Pima County's business. The result was fewer staff members spread thinner over the course of a 24-hour period. As one former NaphCare employee stated to the media, this short staffing led to a norm under which people detained in the Pima County Jail "aren't being seen really at all."

137.    Further, to secure its contract in Pima County, the company depended on telehealth services to act as a stop-gap substitute for on-site providers. But it is farcical to imagine that patients like Ms. Casey with severe mental illness could avail themselves of such telehealth services, and, in fact, they could not.

138.    Even with already unreasonably low levels of contractual staffing, county audits of NaphCare show that the company severely and chronically understaffed its medical care unit in the jail further below the agreed-upon matrix. Pima County discovered this understaffing in a series of internal audits. The County ultimately penalized NaphCare for this and other routine deficiencies by withholding scheduled payments of at least $3.1 million between February 2022 and April 2023.

139.    NaphCare's choice to staff the jail at low levels meant that there were simply not enough medical professionals to serve the jail population. Ms. Casey's injuries were a direct and predicable result of these conscious staffing choices. NaphCare's short staffing—particularly of prescribing mental health providers—caused several critical delays in Ms. Casey's care, including 26 days to be seen for an initial mental health evaluation, 43 days to be seen by a prescribing

provider, 35 days for a follow-up visit from her first prescribing provider, and 101 days to be seen by a prescribing doctor. The failure to staff the jail with "a sufficient number of prescribing providers to effectively manage the... population of mentally ill patients" was an express violation of NaphCare's contract. Short staffing levels were also the reason that so many medical staff were limited in what they could offer Ms. Casey, electing to merely "follow up in 30 days" or "continue to monitor" her despite the severity of her symptoms.

### C.    NaphCare Maintained Policies, Practices, and Customs Not to Attend to Incoming Patients' Prescription Medication Needs

140.    With deliberate indifference, Naphcare also regularly, routinely, and customarily failed to ensure that its policies, customs, and practices were adequate to provide for the medication needs of its patient population. In fact, they were inadequate. Built into its contract with Pima County was an obligation by NaphCare to follow the standards of the National Commission on Correctional Health Care Standards (NCCHC), which is a national accrediting organization that promulgates basic minimum standards of care for corrections facilities.

141.    NCCHC standards required, among other things, that NaphCare staff members inquire into each person's "prescription medications, including type, amount, and time of last use" upon their intake into the jail. NCCHC Standards for Health Services in Jails (2018), J-E-02.[3] This basic and necessary standard is designed to ensure that medical and mental health staff are familiar with newly admitted patients' prior prescription histories, including so that such medications can be continued. The NCCHC Standards for Mental Health Services in Correctional Facilities further provide that an intake screening must "inquire[] into the individual's... history of and current use of psychotropic medications, including the name of the prescriber and pharmacy, if known."

---

[3] In addition to its commitment to "comply with all NCCHC requirements," NaphCare's contract with Pima County specifically names Standard J-E-02 when it contemplates "receiving and booking" in its "scope of services."

NCCHC Standard MH-E-02.[4] Facilitating "continuity of care" for people on psychotropic medications is critically important (as NaphCare's contract with Pima County acknowledges), because failure to do so "increases the patient's risk of decompensating." But NaphCare failed to train its Pima County Jail staff to follow these requirements, and instead implemented practices that skirted past them.

142.    In practice, NaphCare did not include an inquiry into a patient's current or past medications on its basic screening forms which its Pima County Jail staff regularly and customarily used. It was thus a formal policy—or, at minimum, a widespread custom and practice—of NaphCare *not* to inquire into the details of a patient's current, recent, or past use of medications, including psychotropics. As a predictable consequence of this customary failure, NaphCare staff never sought this information for Ms. Casey, leaving them ignorant about her medication needs and leaving her records incomplete for subsequent staff members and providers who should have had this information when encountering Ms. Casey in the days and weeks following her jail admission.

143.    Indeed, former NaphCare Pima County employees acting as whistleblowers indicated that medication is routinely delayed or denied to detainees who need it. These whistleblowers told a reporter that the NaphCare-run pharmacy in the jail was "chaotic," which led to misplaced and delayed medication.

144.    Reported jail grievances filed by other current and former detainees further demonstrate Defendants' widespread pattern, practice, and custom of failing to provide prescription medications. As published in the media, detainees frequently report being denied

---

[4] In addition to its commitment to "comply with all NCCHC requirements," NaphCare's contract with Pima County specifically names Standard MH-E-02 when it contemplates "receiving and booking" in its "scope of services."

medication for such conditions as hepatitis C, serious heart conditions, arthritis, mental illness, and drug withdrawals (methadone). One detainee reported not receiving a bridge order of medication and not being seen by a prescribing provider for nearly six weeks for a serious mental illness. As in Ms. Casey's case, this person went without medication despite NaphCare's knowing the specific prescription regimen needed for their mental health.

145.    Because of these widespread policies, practices, and customs, Ms. Casey was thus deprived of needed medications, which substantially contributed to her decompensation, continued deterioration, and the resulting injuries to her mental and physical health.

146.    Despite explicitly agreeing to do so in its contract with Pima County, NaphCare's staff also continuously and systematically neglected to "(a) determine the most current medication regimen, if any, that patients were prescribed in the community; and (b) ensure that the most current medication regimen is followed until such time as one of [NaphCare's] prescribing providers evaluates the patient and orders… medications." NaphCare never trained, directed, or guided its employees to follow these basic requirements. Accordingly, these requirements were systematically disregarded and ignored. Ms. Casey was thus deprived of her most recent medication regimen for weeks and months on end, leading to her decompensation, continued deterioration, and the resulting injuries to her mental and physical health.

147.    NaphCare and its prescribing providers—including Defendants Nurse Easley and Dr. Samaan—were expected to "immediately… request a bridge order" for any prescription medications that could be verified at the time a patient was taken into jail and to provide those medications within 24 hours. This requirement, essential for the health of the jail population was, again, was well known to NaphCare as the company explicitly agreed that its staff would request such bridge orders in its Pima County Jail contract. As with other commitments, however,

NaphCare ignored it. It failed to train, guide, or instruct its employees to follow it. Thus, as a matter of practice, NaphCare permitted a widespread custom of failing to request bridge orders—a custom that resulted in no bridge order being obtained for Ms. Casey—leading to her decompensation, continued deterioration, and the resulting injuries to her mental and physical health.

## D. NaphCare Maintained Policies, Practices, and Customs Not to Request or Review Medical Records

148.    NCCHC standards further caution that when arrested individuals "indicate that they are under treatment for a… mental health problem… health staff should initiate a request for a health summary from community prescribers." Discussion, NCCHC Standards for Health Services in Jails (2018), J-E-02. In NaphCare's contract with Pima County, it agreed to adhere to this NCCHC Standard, among others. But NaphCare never trained, instructed, guided, or directed its Pima County Jail employees to do so. And, as a matter of routine, custom and practice, they did not. Ms. Casey was a victim of this practice among others. Despite authorizing the release of her Sonora Behavioral Health records—records that would have shown what medications she needed and provided other essential information about her medical health history—NaphCare's employees made no effort to gather this data. Ms. Casey's medical team in the jail was thus left ignorant of her full mental health history, leading to her continued decompensation.

149.    NaphCare knew that it was critical that its staff members pay close attention to the medical records associated with any prior incarceration of a newly admitted patient. Indeed, in its contract with Pima County, NaphCare committed that its employees would review every arrestee's jail database record within 24 hours of their medical clearance into jail "to determine whether a patient has prior bookings" and to "review *all available prior health care records*." (Emphasis added.) Relatedly, NaphCare promised that it would "request and review all available outside records of which they are made aware" including, but not limited to, "other correctional facilities,

hospitals, specialty care or outpatient clinics." However, NaphCare never trained, instructed, or directed that its employees follow these important requirements. It was, in fact, the widespread custom of NaphCare's Pima County Jail employees *not* to query each patient's database within 24 hours of their arrest or to request and review patients' outside medical records. As a result, essential records from Ms. Casey's prior Pima County incarceration and from outside providers were not sought or reviewed. This was a moving force leading to initial failings in care that started Ms. Casey on the path of decompensation and led to additional failures in care that caused her downward spiral to continue unchecked.

### E.    NaphCare Maintained Policies, Practices, and Customs that Otherwise Fell Below Contractual and External Standards

150.    NaphCare also knew the importance of prompt mental health assessments by appropriate professionals. This requirement was built into NaphCare's Pima County Jail contract in that NaphCare specifically agreed to provide "patients referred for mental health services" during their receiving screening with a mental health assessment "within 14 days of admission to the facility." Despite this, NaphCare failed to train, guide, or direct its employees to follow the requirement or provide the staff to meet it, and its staff members routinely, regularly, and customarily failed to do so. As part of this routine, regular, and customary failure, Ms. Casey was not promptly seen for her mental health needs at the Pima County Jail. By the time she was eventually seen, she had already begun suffering and significantly decompensating.

151.    NaphCare also agreed in its Pima County Jail contract to "develop a mechanism to review all minute entries received from the court" in its patients' criminal cases and to "maintain a log of all minute entries received, including the date received and action taken, and make the log available for County review." This obligation was particularly important in cases like Ms. Casey's in which a patient was ordered into the "restoration to competency" program. NaphCare had strict

orders in such cases "not [to] change or substitute prescribed medications" and to, "at minimum," provide such patients with a comprehensive psychiatric assessment, a mental health treatment plan, and prescription medications. In truth, NaphCare ignored this requirement and did not implement the required mechanism, resulting in a widespread custom and practice of failing to maintain the required logs and failing to respond accordingly to court entries. The result was patients falling through the cracks and failing to receive care that would otherwise be due. This widespread custom was a contributing factor and moving force in Ms. Casey's decompensation, continued deterioration, and the resulting injuries to her mental and physical health. Indeed, NaphCare personnel failed to take any responsive action even when Ms. Casey was officially declared incompetent by the court.

## F.    Despite Clear Warning Signs, Pima County Continued to Entrust NaphCare with the Critical Task of Providing Jail Medical and Mental Health Care

152.    Pima County and Sheriff Nanos trusted NaphCare to provide medical and mental healthcare in their jail facility—a duty for which they remain legally responsible irrespective of any private contract—despite signs that NaphCare was bound to cut corners in its provision of patient care. For instance, prior to selecting NaphCare for an over $17 million contract without competitive bidding, Pima County and its officials knew or should have known that NaphCare had entered a $700,000 settlement over alleged violations of the False Claims Act. Pima County also selected NaphCare based in part on its promise to divide the workday into two 12-hour shifts rather than three 8-hour shifts (to decrease its total number of staff) and to rely on telehealth services for nurse practitioners. The explicit prioritization of profitability permitted NaphCare to adopt and carry out its harmful and reckless policies, practices, and customs described in paragraphs 125-151.

153.    NaphCare was later financially penalized for routinely failing to comply with the terms of its contract in the Pima County Jail from April through August of 2022, the time of Ms. Casey's incarceration and decline, including a sizable $16,000 penalty for August of 2022.

154.    Mary Casey was far from the only person to suffer and die because of NaphCare's unconstitutional policies, practices, and customs. In general, the death rate in NaphCare jails is significantly higher than usual. A Reuters study recently found that jails where NaphCare operates have higher death rates than the national average, and the highest death rates of any private correctional healthcare provider. And at the Pima County Jail, the rate of deaths has been profoundly out of the ordinary. From January 2022 to September 2023, at least 39 people died in the jail's custody or shortly after their release. In 2022 alone, 23 total people died in the Prima County Jail, and that figure does not include Ms. Casey. This puts Pima County's jail mortality rate at nearly seven *times* the national average according to the Bureau of Justice Statistics' most recent tables.[5] In 2021, someone died in the Pima County Jail approximately every 31 days.

155.    At the time of Ms. Casey's confinement, there had been multiple recent instances of detainees being systematically denied constitutionally adequate medical care in the Pima County Jail. Several of these instances resulted in preventable deaths. Among these is the February 2022 death of Sylvestre Miguel Inzunza, IV, who died in his cell at the Pima County Jail while there were limited corrections staff and *no* NaphCare staff checking on him. As stated in a lawsuit brought by Inzunza's family, an independent administrative decision on Defendant Nanos's part was "a moving force" behind the "catastrophically low staffing levels at the Jail" that enabled

---

[5] BJS estimates that in 2019, the nationwide morality rate in local jails was 167 deaths per 100,000 jail detainees. In 2022, Pima County experienced 23 deaths with a population of less than 2,000. Multiplied by fifty, Pima County's deaths per 100,000 detainee rate is thus approximately 1,150 deaths per 100,000 detainees compared to the national average of 167 deaths per 100,000. Put differently, this rate means that more than 1 of every 100 detainees in the Pima County Jail dies.

Inzuza to die in early 2022. Defendants Pima County, Sheriff Nanos, and NaphCare were aware of these deaths, which were covered extensively by local media outlets. Indeed, Defendant Nanos has commented to the media numerous times about the high number of deaths in his jail, acknowledging that the facility is in a "full-blown crisis" at a "life-threatening level."

156.    In July of 2022, after numerous high-profile deaths in the jail, the Pima County Board of Supervisors questioned the decision to continue to contract with NaphCare. The County considered the cost of moving such care in-house. In electing to stay with the status quo, the County relied in large part on the notion that NaphCare as an NCCHC-accredited company would "minimize[e] the occurrence of adverse events, thus avoiding healthcare-related lawsuits and grievances," and the belief that the County's insurance broker would not provide coverage for jail medical care. Pima County thus prioritized cost savings—in the face of abnormally high jail death figures—and thus has continued to entrust NaphCare as the sole provider of medical and mental health care in its jail facilities.

157.    NaphCare maintained the foregoing unconstitutional customs, practices, and policies with deliberate indifference to the rights of its patient population, and it was foreseeable that the customs, practices, and policies of NaphCare would cause significant harm to NaphCare's patients.

158.    Notwithstanding its decision to contract with NaphCare, Pima County and Sheriff Nanos maintained constitutional duties to afford adequate medical and mental health care to the people they incarcerated. That duty could not be delegated away, and the County and Sheriff Nanos remain liable for all of NaphCare's unconstitutional and harmful policies, practices, and customs as well as for the illegal and unconstitutional conduct of NaphCare employees.

**G.     Sheriff Nanos Knew the Aforementioned Policies were "Life Threatening" But Failed to Take Available Action**

159.    Defendant Nanos has fully acknowledged that the conditions at his jail, including failure to provide adequate medical care and short staffing levels, constitute a "life threatening" crisis. He has also specifically spoken about how ill-equipped the Pima County Jail is to serve mentally ill patients like Ms. Casey, who Nanos acknowledges would be "better serviced elsewhere." Moreover, Sheriff Nanos knows the importance of psychotropic medications for mentally ill patients, stating to the media "you don't get on psychotropic meds because we want you to feel good… it's a mental health problem." Yet Nanos presides over a jail that routinely fails to treat mental illness or provide needed prescription psychotropics to its patients.

160.    Defendants Nanos failed to utilize authority vested in him as the Pima County Sheriff to improve conditions in his jail and save lives like Ms. Casey's. For example, A.R.S. § 11-455 authorizes Nanos to employ sentenced individuals in the jail to any "labor or occupation" that "he deems necessary." Sheriff Nanos could use this authority to employ trusted detainees to become mental health peer supporters—a practice that has been adopted in other correctional settings and could improve the delivery of mental health care in the jail. But he has made no effort to do so.

161.    Sheriff Nanos is also empowered by law to move certain sentenced individuals from the jail into a "community restitution" or "home detention program." A.R.S. § 11-459. The Sheriff is singularly authorized to select eligible persons for alternatives to confinement, to require electronic location monitoring of such individuals if he so chooses, and/or to structure community release, work release, or other rehabilitative programs in his discretion. *Id.* Though Defendant Nanos recognizes that many mentally ill persons should not be confined in his jail in the first place, and has the legal authority to move them, he has made no efforts to identify candidates for home

confinement or community restitution, to establish programs to create alternatives to jail incarceration, or to release eligible detainees.

## VII.    PUNITIVE DAMAGES

162.    All acts or omissions of NaphCare described in the foregoing paragraphs were committed with at least reckless disregard for Ms. Casey's federally protected rights, thus subjecting the company to punitive damages actionable under 42 U.S.C. § 1983.

163.    All acts or omissions of the individual defendants described in the foregoing paragraphs were committed with at least reckless disregard for Ms. Casey's federally protected rights, thus subjecting the individual defendants to punitive damages actionable under 42 U.S.C. § 1983.

## VIII.    CERTIFICATION REGARDING EXPERT OPINION FOR MEDICAL MALPRACTICE CLAIM

164.    As set forth in A.R.S. § 12-2603, Plaintiffs submit that an expert's opinion is necessary to prove the health care professional's standard of care and/or liability for their medical malpractice claim.

## IX. CLAIMS FOR RELIEF

**Count I: Against Defendant NaphCare, 42 U.S.C. § 1983** (Constitutionally Deficient Medical and Mental Health Care, Denial of Access to Counsel and Courts, and Denial of Speech and Association Rights in Violation of the United States Constitution)

165.    Defendant NaphCare, through its lucrative contract with Pima County, accepted responsibility for the provision of all medical and mental healthcare for detainees like Ms. Casey and was obligated to adequately provide for her mental and medical healthcare under the Fourteenth Amendment. It is liable under 42 U.S.C. § 1983 for violating her Fourteenth Amendment rights as described in this complaint. In the alternative, if Ms. Casey's right to adequate mental and medical healthcare are sourced in the Eight Amendment, NaphCare is liable

under § 1983 for violating her Eight Amendment right to adequate mental and medical healthcare. Insofar as NaphCare deprived Ms. Casey of her rights to counsel or the courts under the Fourteenth Amendment it is further liable under § 1983. And insofar as NaphCare deprived Ms. Casey of her First Amendment right to communicate with her counsel, her family, or others, it is further liable under § 1983.

166.    As described in the foregoing paragraphs, especially paragraphs 125-151, NaphCare maintained numerous policies, customs, and/or practices that caused Ms. Casey to receive constitutionally inadequate care, to decline significantly in her mental and physical health, to deprive her of her constitutional rights, and ultimately to die. Among those policies, customs, and/or practices were: (a) a widespread custom, policy, and practice of providing insufficient on-site leadership support, (b) a widespread practice of maintaining inadequate staff to provide medical and mental healthcare; (c) a policy not to screen incoming arrestees to determine whether they required, or had a history of taking, prescription medication; (d) a widespread practice and custom of *not* obtaining patients' medical histories, including records from in and outside the Jail; (e) a widespread practice of failing to provide a timely mental health assessment; (f) a widespread practice of failing to provide timely access to prescribing providers; (g) a widespread practice of not monitoring court orders in the cases of detainees deemed incompetent to stand trial; (h) an explicit policy and custom of deprioritizing off-site medical care, even in serious cases; and (i) a widespread practice and/or custom of failing to escalate acute medical cases in a timely manner.

167.    NaphCare made a series of intentional decisions to maintain the above-listed practices, customs, and policies. The above-listed practices, customs, and policies subjected Ms. Casey to an unreasonable and substantial risk of serious harm. NaphCare was deliberately and recklessly indifferent to these risks.

COMPLAINT – Page 59

168.    Because of these widespread customs, policies, and practices, Ms. Casey decompensated, declined in her physical and mental health, suffered grievously, and died in violation of her constitutional rights to adequate medical and mental healthcare. As a result, NaphCare is liable to the Estate of Mary Casey under 42 U.S.C. § 1983 for all resulting damages.

169.    Plaintiffs Kepler and Casey maintain a distinct Fourteenth Amendment liberty interest to the society and companionship of their mother.

170.    The same constitutional violations by NaphCare outlined in Paragraphs 165-168, *supra*, infringed Plaintiffs Kepler and Casey's due process rights by causing their mother to die and depriving them of their individual Fourteenth Amendment constitutional rights to her society and companionship. NaphCare is liable to Karina Kepler and Carlin Casey under 42 U.S.C. § 1983 for all resulting damages.

**Count II: Also Against Defendant NaphCare, A.R.S. § 12-562** (Medical Malpractice)

171.    NaphCare owed Ms. Casey a duty of care as the licensed health care provider responsible for overseeing and administering medical and mental health care in the Pima County Jail. NaphCare was, at all relevant times, a licensed healthcare provider within the meaning of A.R.S. § 12-561.

172.    Under Arizona's medical malpractice statutes, NaphCare is vicariously liable under traditional principles of *respondeat superior* for all acts or omissions of the individual defendants alleged in this complaint that violated the standards of care applicable to them. Moreover, as discussed extensively, *supra*, NaphCare itself, even independently of its vicarious liability for its employees' acts and omissions, failed to exercise that degree of care, skill, and learning expected of a reasonable, prudent corporate correctional healthcare provider acting in the same or similar circumstances. It did so by: (a) failing to identify Ms. Casey's medication and mental healthcare needs; (b) failing to prescribe her needed medications; (c) failing to administer adequate

medication and treatment; (d) failing to adequately staff the Jail with mental health and medical care providers; (e) failing to monitor court orders and developments that would impact Ms. Casey's care; (f) explicitly prioritizing cost-savings over emergency intervention and disincentivizing referrals to off-site care; (g) failing to urgently intervene when Ms. Casey began to decline; (h) failing to provide adequate on-site leadership for jail staff; and (i) failing to obtain or review patient medical records, either from outside facilities or the jail itself.

173.    These failures were a proximate cause of Ms. Casey's immeasurable physical and emotional suffering, worsening condition, wasting, and death. In addition to the physical and mental suffering and loss of life Ms. Casey endured, her estate also—on information and belief— accrued numerous healthcare and hospice costs because of this negligence. NaphCare is liable to the Estate of Mary Casey under ARS § 12-562 for all resulting damages.

**Count III: Also Against Defendant NaphCare, A.R.S. § 12-611** (Wrongful Death)

174.    As detailed throughout this Complaint and specifically in paragraphs 52-117, 126-154, and 166-168, NaphCare's wrongful acts, negligence, and omissions wrongfully and unlawfully caused Ms. Casey to die. NaphCare is also vicariously liable for the wrongful acts, negligence, and omissions of its employees, which also wrongfully and unlawfully caused Ms. Casey to die. NaphCare is thus liable for wrongful death under A.R.S. § 12-611.

175.    Under A.R.S. § 12-611, Ms. Casey's surviving heirs, Plaintiffs Kepler and Casey— in their individual capacities and as co-personal representatives of Ms. Casey's estate—thus also seek recovery against NaphCare for their injuries resulting from Ms. Casey's death. These include, but are not limited to, their individual emotional suffering, loss of society and companionship, funeral expenses, and other costs associated with the death of Ms. Casey. NaphCare is liable for all resulting damages under ARS § 12-611.

**Count IV: Against Individual Medical Defendants, 42 U.S.C. § 1983** (Constitutionally Deficient Medical and Mental Health Care in Violation of the United States Constitution, Fourteenth Amendment)

176.    Individual medical defendants Chamberlain, Easley, Karsten, Samaan, and Woods assumed responsibility for Ms. Casey's medical and mental health care through their employment with NaphCare. Acting under color of law, they were obligated to her under the Fourteenth Amendment or, alternatively, under the Eight Amendment. But each of them acted with deliberate indifference to her serious mental and/or medical healthcare needs, and their individual deliberate indifference caused her decompensation, suffering, continued decline and, ultimately, her death. They are liable to the Estate of Mary Casey under 42 U.S.C. § 1983. They are also liable under § 1983 to Karina Kepler and Carlin Casey for depriving them of their Fourteenth Amendment rights to the society and companionship of their mother.

**Count V: Also Against Individual Medical Defendants, A.R.S. § 12-562** (Medical Malpractice)

177.    The individual medical defendants Chamberlain, Easley, Karsten, Samaan, and Woods owed Ms. Casey a duty of care as her licensed health care providers. A.R.S. § 12-561.

178.    As discussed extensively, *supra*, including in paragraphs 46-106, these individual medical defendants breached the standards of care applicable to them by failing to exercise that degree of care, skill, and learning expected of reasonable, prudent health care professionals acting in the same or similar circumstances. These failures were a proximate cause of Ms. Casey's immeasurable physical and emotional suffering, worsening condition, wasting, and death. In addition to the physical and mental suffering and loss of life Ms. Casey endured, her estate also accrued numerous healthcare and hospice costs because of this negligence. These individual defendants are liable to the Estate of Mary Casey for all resulting damages under ARS § 12-562.

**Count VI: Also Against Individual Medical Defendants, A.R.S. § 12-611** (Wrongful Death)

179.    As detailed throughout this Complaint, the wrongful acts, negligence, and omissions, of individually defendants Chamberlain, Easley, Karsten, Samaan, and Woods wrongfully and unlawfully caused Ms. Casey's death, thus making these defendants liable for wrongful death under A.R.S. § 12-611.

180.    Under A.R.S. § 12-611, Ms. Casey's surviving heirs, Plaintiffs Kepler and Casey—in their individual capacities and as co-personal representatives of Ms. Casey's estate—thus also seek recovery against Individual Medical Defendants for their injuries resulting from Ms. Casey's death. These include, but are not limited to, their individual emotional suffering, loss of society and companionship, funeral expenses, and other costs.

**Count VII: Against Defendant Pima County, 42 U.S.C. § 1983** (Constitutionally Deficient Medical and Mental Health Care in Violation of the United States Constitution, Fourteenth Amendment)

181.    When Pima County detained Ms. Casey, it assumed responsibility for her medical and mental healthcare—a duty it could not delegate away. All detained persons are constitutionally entitled to adequate care, and Pima County is liable under 42 U.S.C. § 1983, pursuant to the non-delegable duty doctrine, for all Fourteenth Amendment (or, in the alternative, Eighth Amendment) violations caused to the Estate of Mary Casey because of the unconstitutional policies, customs, or practices of NaphCare as alleged in this Complaint. For the same reasons, Pima County is liable under § 1983 for the Fourteenth Amendment losses of society and companionship with their mother caused to Karina Keppler and Carlin Casey individually.

**Count VIII: Also Against Defendant Pima County, 42 U.S.C. § 1983** (Violation of the Doctrine of Unconstitutional Conditions, Right of Access to Counsel and Court: U.S. Constitution, First and Fourteenth Amendments)

182.    The government may not condition the exercise of one constitutional right on the forfeiture of another. By impeding Ms. Casey's ability to meet with her attorney or attend her own

COMPLAINT – Page 63

court proceedings, in violation of her First and Fourteenth Amendment rights, Pima County violated the doctrine of unconstitutional conditions and infringed these foundational rights of access to counsel and due process. These violations came at great prejudice to Ms. Casey, in that depriving her of access to counsel and the courts contributed to her suffering and demise. Pima County is liable to the Estate of Mary Casey under 42 U.S.C § 1983 for these constitutional violations.

**Count IX: Against Defendant Chris Nanos 42 U.S.C. § 1983** (Constitutionally Deficient Medical and Mental Health Care in Violation of the United States Constitution, Fourteenth Amendment)

183.    When Sheriff Nanos detained Ms. Casey, he became her legal custodian and assumed responsibility for her medical and mental healthcare. This duty could not be delegated away. All detained persons are constitutionally entitled to adequate care, and Sheriff Nanos is liable under 42 U.S.C. § 1983, pursuant to the non-delegable duty doctrine, for all Fourteenth Amendment (or, in the alternative, Eighth Amendment) violations caused to the Estate of Mary Casey as a result of the unconstitutional policies, customs or practices of NaphCare as alleged in this Complaint. For the same reasons, Sheriff Nanos is liable under § 1983 for the Fourteenth Amendment losses of society and companionship with their mother caused to Karina Keppler and Carlin Casey individually.

**Count X: Also Against Defendant Chris Nanos, 42 U.S.C. § 1983** (Violation of the Doctrine of Unconstitutional Conditions, Right of Access to Counsel and Court: U.S. Constitution, First and Fourteenth Amendments)

184.    The government may not condition the exercise of one constitutional right on the forfeiture of another. By impeding Ms. Casey's ability to meet with her attorney or attend her own court proceedings, in violation of her First and Fourteenth Amendment rights, Sheriff Nanos violated the doctrine of unconstitutional conditions and infringed these foundational rights of access to counsel and due process. These violations came at great prejudice to her, in that depriving

Ms. Casey of access to her counsel and the courts contributed to her suffering and demise. Sheriff Nanos is liable to the Estate of Mary Cassey under 42 U.S.C § 1983 for these constitutional violations.

## X.  JURY DEMAND

185.    Plaintiffs demand a trial by jury.

## XI.  REQUEST FOR RELIEF

186.    Plaintiffs asks the Court for the following relief:

187.    All compensatory damages authorized by law to the Estate of Mary Casey, including but not limited to damages for Ms. Casey's mental, physical, and emotional pain and suffering leading up to her death, her medical bills and costs of care, her loss of life, and the loss of the value and enjoyment of her life;

188.    All compensatory damages authorized by law to Karina Kepler and Carlin Casey individually, including but not limited to all damages flowing from the loss of society and companionship of their mother, and all emotional suffering, losses, costs, and recoverable damages flowing from Ms. Casey's wrongful death.

189.    Punitive damages against NaphCare;

190.    Punitive damages against all individual defendants;

191.    A declaration that Defendants Sheriff Nanos and Pima County violated Ms. Casey's constitutional rights by failing to afford her the opportunity to meet with her attorney or provide her with court access as a result of her health condition, resulting in great prejudice to her;

192.    Attorneys' fees and all recoverable litigation costs under 42 U.S.C. § 1988; and

193.    Any such other relief as the Court deems just and proper.

//

//

COMPLAINT – Page 65

Respectfully submitted this 25th day of April, 2024.

*/s/ Andrea R. Woods*
Andrea R. Woods, WSBA # 48265 (pro hac vice)

*On behalf of all counsel for Plaintiffs:*
Edwin S. Budge, WSBA #24182 (*pro hac vice*)
Erik J. Heipt, WSBA #28113 (*pro hac vice*)
Andrea R. Woods, WSBA #48265 (*pro hac vice*)
**BUDGE & HEIPT, PLLC**
808 East Roy Street
Seattle, WA 98102
andrea@budgeandheipt.com
ed@budgeandheipt.com
erik@budgeandheipt.com
(206) 624-3060